Final case on our call this morning is agenda number 13, case number 104-538, Sheila M. Wills v. Inman E. Foster Jr. et al. Ms. de Saint Phalle, is that how you pronounce that? Yes, Your Honor. Okay, you may proceed. May it please the Court, my name is Alexandra de Saint Phalle, and I represent the plaintiff, Sheila Wills, in this case. I also represent the interests of every tort victim in this state who is either poor or over age 65. I mention the poor and the elderly as my clients because the precedential value of your decision in this case will affect their lives for years to come. The fundamental issue in this case is whether the rule that this Court adopted in Arthur v. Couture applies to the poor and the elderly. In Arthur, this Court decided that privately insured plaintiffs are entitled to recover the reasonable value of their medical services despite whatever discounts their insurers received. The issue in this case is whether the poor and the elderly will also be able to recover the reasonable value of their medical expenses despite whatever discounts Medicaid or Medicare received. Can I ask a factual question? Sure. In Arthur, we held that even though the plaintiff can submit the entire bill amount to the jury, the plaintiff cannot establish a prima facie case of reasonableness based on the bill alone and must introduce other evidence establishing the reasonable cost of the service. In this case, did you introduce other evidence to establish the reasonableness of the bill amount? No, Your Honor, and the reason why is because the defense stipulated to the admissibility of the bills. That's a good answer because otherwise there would be an argument to be made that even if the Arthur rationale applies in Medicaid and Medicare cases, that the trial court was correct in reducing the award because you didn't establish the reasonableness. But what you're telling me right now is there was a stipulation as to the reasonableness of the bills. Yes. Okay, thank you. Yes. Now, the Fourth District attempted to answer the question of whether or not there should be a difference between privately insured and publicly insured plaintiffs by relying on the collateral source rule. But its view of the collateral source rule is mistaken for four reasons. First off, in Arthur, this court defined collateral sources as benefits which are wholly independent of and collateral to the tortfeasor. Medicare and Medicaid are benefits which are wholly independent of and collateral to the tortfeasor. Second, the appellate court majority failed to notice that in this court, Arthur relied on Section 920A, Comment B, to the restatement of torts. Comment B states that if benefits are provided by law, the plaintiff should not be deprived of the advantage of those benefits. Comment C to the restatement of torts specifically states that both Social Security and welfare benefits are collateral sources. Third, the appellate court majority failed to perceive that the policy reasons discussed in Arthur and the restatement are equally applicable to both private and public insurance benefits. Both Arthur and the restatement noted that it is the position of the law that a benefit directed to the injured party should not be shifted to become a windfall for the tortfeasor. Arthur cited the Marani case. In Marani, the court said what is crucial is that the tortfeasor not become the real beneficiary of a stranger's Both of these policy initiatives are equally applicable to privately insured as well as publicly insured plaintiffs. Finally, the appellate majority failed to perceive that the additional policy objective mentioned in Arthur, i.e. that the defendant shouldn't be entitled to take advantage of expenditures made by the plaintiff, was not the only rationale that Arthur offered for the collateral source rule. Although Arthur mentioned... Counsel, can I ask you this when you're on the appellate court argument? And I understand you distinguished the Peterson case. I guess that was the Shriners Hospital and the gift type of situation. But would it be your position that in light of Arthur and in light of what you're asking this court to do in this case, that Peterson should be overruled? Certainly it is our preference that Peterson be overruled. However, the fundamental distinction between Peterson and this case is the issue of timing, which this court announced in Arthur. In the Arthur case, this court decided that the issue of whether a plaintiff incurred a liability for a medical bill was made at the time of service, not when the final bill was eventually issued. Arthur noted that the liability for medical bills was not somehow extinguished merely because the providers decided to submit their bills directly to the insurance company. Nor was the liability less because the insurers later discharged the bill for less. Precisely the same thing is applicable in this case. Sheila Wills became liable for the reasonable value of the medical services upon her receipt of those services. That the medical providers later decided to submit their bills to Medicaid did not extinguish her initial liability for those bills that she incurred by receiving the services. Sheila Wills could not force her doctors to submit their bills to Medicaid. Indeed, just as with private insurance, more and more medical providers are choosing not to submit their bills to Medicaid or to Medicare when they realize that there is the possibility of a lawsuit or third-party liability. And the reason why they don't is because of those discounts. If the hospitals and medical providers don't submit their bills to Medicare or Medicaid, they can file a lien in the underlying lawsuit and seek to get full recovery of their bills without any discounts. So now, when accident victims go to the hospital, the first thing the hospitals ask is, were you involved in an accident? They want to find out if there's the possibility of third-party insurance because they don't want to bill Medicare and Medicaid. Medicare and Medicaid is only the last resort. Now, the appellate court's reliance on Peterson v. Lubachra Chevrolet is misplaced precisely because of this timing issue. In Peterson, the plaintiff never incurred a liability for medical services. Shriners Hospital in Peterson agreed to provide those medical services gratuitously even before the plaintiff entered its doors. Here, however, as was noted in the Nikon case, there is no evidence that the medical providers ever intended to provide their services gratuitously. The medical providers did generate bills. With regard to billing, they had a choice. They could either bill Sheila Wills directly, like Dr. Trudeau did, or else they could submit their bills to Medicaid. The medical providers had no legal obligation to bill Medicaid. It's true that once the medical providers billed Medicaid, they couldn't bill the plaintiff for the balance, but the same was true in Arthur. There, once the medical providers billed the insurance company, they could not come after the plaintiff for the balance. So the privately insured plaintiff in Arthur and the publicly insured plaintiff in this case are in precisely the same situation. Thus, there's no inconsistency between Peterson and this case. In Peterson, the plaintiff never incurred the liability. Here, Sheila Wills did incur the liability upon her receipt of the service. At that moment, as in Arthur, the plaintiff became entitled to recover the reasonable value of her medical bills. The lesson of Arthur is that what happened later to discharge those bills does not change the analysis. Thus, it doesn't matter whether the plaintiff incurred, as the defendants talk about it, expense, obligation, or liability to discharge those bills, because in Sheila Wills' case, the obligation to pay the liability was incurred at the time of service. Now, it's not just the textual analysis of the Arthur opinion that supports the inclusion of the poor and the elderly within its position, but it's also strong policy reasons as well. First off, permitting the plaintiff to recover Medicaid discounts is not a windfall for the plaintiff. Let's look at the facts of this case. The medical bills were $80,000. The plaintiff received a pain and suffering award, non-economic damages of $7,500. There is no way that that was a compensatory award, or if plaintiff got the discounts, would it be a windfall. Now, although it's true that this was obviously a particularly parsimonious jury, but that is all too frequently the case downstate, no plaintiff truly receives a compensatory award because of the fact that every plaintiff must have her attorney's fees subtracted from her award. So no plaintiff is truly ever restored to the prior condition that she had before an accident. That argument was made in a law review that Justice McMurrow cited in her dissenting opinion in Arthur. The St. Mary's Law Journal article made that argument. Also, damages for the elderly and poor persons are already limited by external factors. Obviously, by definition, their loss of earnings is less. Their damages for pain and suffering are less by their limited life expectancy. And in addition, due to the vicissitudes of being poor and elderly, the poor and the elderly generally have a lesser ability to explain and convey their pain and suffering than do more affluent victims. How often have we looked at a tort victim that may have poor teeth or something like that? And we know that that victim is going to receive less in court than a more affluent victim simply due to inherent juror prejudices. Now, there's nothing that this court can do to resolve that in the contours of this case. However, what happened below is that the appellate court needlessly added to those inherent prejudices by pronouncing one rule for the rich and a different rule for the poor and the elderly. And as Delegate Anderson said back in 1870, governments were not made to make the rich richer and the poor poorer. Even the legislature has acknowledged that collateral sources should not be used to reduce an award by more than 50%. And that statute, that section 2-1205, isn't specifically applicable to this case. But again, it is some indication that no, collateral sources are part of a plaintiff's compensation. Even if there were a windfall to the plaintiff, there's no reason in law, equity, or good conscience can be advanced why a wrongdoer should benefit from a collateral source of damages caused by his wrongful act. Another policy reason why a distinction should not be made between privately insured plaintiffs and publicly insured plaintiffs is that if this court adopts the rule that Medicaid and Medicare recipients are not entitled to procure their discounts, it will encourage tortfeasors to delay settlements. Under the Medicare regulations, medical providers have up to 27 months to make a decision about whether or not to submit their bills to Medicare. So during that entire 27 month period, defendants can hope that the medical providers will get tired of waiting for payment of their bills. And rather than seek the full payment in the underlying lawsuit, they may want to submit their bills to Medicare for a certain reimbursement as opposed to a later reimbursement of a later amount down the road. This specific policy was noted in the Industrial Commission's opinion in Ellis v. Top Notch Colonels, and it said, it was a workers' comp case, but it said, wait a minute, we can't let employers take advantage of Medicare rates because of the fact that number one, it will cause employers to delay paying medical bills in hopes that the doctors will later submit their bills. And second, the injuries that are due to workers' comp injuries or injuries that are due to accidents, the financial burden of those should be caused by the industry or the tortfeasor itself and not by the public purse. And that really is the fourth policy reason. The tortfeasor, rather than the public generally, should bear the costs of accidents. That furthers the deterrent purpose of the law that this court noted in Simonek v. Lutheran General Hospital. The public at large should not be forced to bear the costs of wrongdoer negligence. Finally, there is the policy of having a uniform rule of law. A tortfeasor should not have their damages vary by the mere fortuity of whether or not the plaintiff happened to be publicly or privately insured. That policy was ably explained by our sister court in Wisconsin in Ellsworth v. Shelbrock. Again, just because when the same accident takes place and the same injuries, the value of the decision should not vary based on whether there is public or private insurance. For those reasons, as well as the fact what the appellate court did in this case, it failed to notice that the one other policy reason that the Arthur Court indicated for coming to its decision, i.e. that not allowing defendants to take advantage of expenditures made by the plaintiff, was only one of the policy reasons that Arthur offered. And as this court stated in Rosewood Care Center v. Caterpillar, what the appellate court did, it took general language from Arthur that defendants should not be able to take advantage of expenditures made by the plaintiff and concocted a far broader rule than the factual circumstances of Arthur required. The expenditures was but one reason for the collateral source. It was not its entire reason debtor. Thank you. Thank you, Ms. Dyson-Fowl. Mr. Latterman? Thank you, Your Honor. May it please the Court. This case presents the question how to address the circumstance of a plaintiff who receives medical expenses, medical services, which are rendered on a partially gratuitous basis. The gratuitous service is obtained without cost, obligation, or expense on the part of the plaintiff. Historically, Illinois has recognized and stood in the minority of states in recognizing a gratuitous benefits exception or precursor to the collateral source rule. In doing the research, I chased back to 1907 where we have Jones and Adams v. George. In that case, this Court held the plaintiff may not recover gratuitously rendered nursing services. In that case, a young child was injured in an accident. His mother stayed home and nursed him back to health. During the course of the lawsuit, the parties, the plaintiff tried to recover what they deemed were reasonable expenses for mother's nursing services. However, because there had been no expense, obligation, or cost to receive those nursing services, the plaintiff was not allowed to recover those. Illinois doesn't have much discussion on this, and that was a very, very clear decision from the Court at that time. Illinois doesn't have much discussion on this issue until 1979 when we come up to the Peterson v. Lubeck-Roe case. And in that case, as we are all familiar with from the Arthur case and from this case, again, a plaintiff was not allowed to recover gratuitously rendered medical services. In that case, the Peterson case, the plaintiff had received medical services at Shriners Hospital at no charge to the plaintiff. We now come up to 2005, and we get a little different question presented to the Court in the Arthur case. The Court was presented with and struggled with what do we do with private insurance and where there is a difference and a distinction between the amount the provider puts on their bill for the services and the amount that the private insurer pays. The Court never really addressed and answered the question, but we got an excellent dissertation on the evidentiary and the substantive considerations and underpinnings of the collateral source rule. So we have a gap here. In Arthur, we have a plaintiff allowed to introduce the reasonable expense of those necessary medical services providing she meets the evidentiary criteria. Was there a stipulation in this case that the bills were fair and reasonable? There was not a stipulation per se. We did not contest the foundation for the medical bills. This issue had been set up in pretrial motions in the case, so we knew the Court would go one way or another on it, and there was no point in taking up the jury's time with that. Mr. Lauderman, how do you address the prejudice that a plaintiff is subject to? We're in a different time than 1905. There are contracts between the vendors and the insurers, and we looked at that in Arthur. There's Medicaid and Medicare. The damages as they relate to any case, and in this case I heard pain and suffering I think was at $7,500. Correct, Your Honor. I would think it's not going too far afield to say that in trials, juries do look at the amount of medical bills and could look at the amount of reduced medical bills as somehow impacting upon an award of pain and suffering. Isn't there prejudice in these cases where in this case we have the elderly Medicare Medicaid, where in the Arthur case we have the contract of insurance, that at least that full amount of medical services is put in front of the jury if they're going to use that in some fact or fashion to determine what the pain and suffering was? Certainly. In this case, I think this case serves to belie the myth behind juries pinning pain and suffering awards or loss of a normal life award to medical bills. The medical bills in this case ran around $70,000, and the numbers are in the briefs. The pain and suffering award was $7,500. The jury in this case was presented the full medical bills. They were presented with the list price of the medical bills at trial, and that's what they awarded. They awarded dollar for dollar the list price of the medical bills in the case. They looked at the plaintiff's injuries, and they said, plaintiff, in our experience, based on the way you appear to us, the way you present to us, having heard all of the medical testimony, having heard from physicians about your surgery and what you underwent, we believe a reasonable value for your loss of a normal life and your pain and suffering is $7,500. So, in fact, that is not pinned to the medical bills. Now, there is a distinction between Medicare and Medicaid and private insurance and those bills. We have a circumstance where courts have consistently held and repeatedly held the window, the difference between what the physician shows on the bill and the amount that Medicare and Medicaid pay is a gratuitous benefit to the plaintiff. And looking at that, you look at the statutes themselves and some of the courts that have analyzed those. Under the Medicare statute and under the Medicaid statute, the patient is never, ever responsible for the list price that the physician shows on the bill. The patient is only responsible for, and in fact never sees that bill, is only responsible for the amount that Medicaid bills, and the provider cannot come back to the plaintiff and balance bill the plaintiff for that difference. The physician may only collect from Medicaid, from Medicare, the prearranged, prenegotiated rate with them. I want to just get back for a minute to this pain and suffering issue as I'm thinking about it. I mean, I think there's war stories that you could draw from other circuits in our state where the medical bills might have been $50 and the pain and suffering award was astronomical. And you could still say that there wasn't any correlation. But, you know, defense attorneys argue all the time, right, if the medical bills, you know, he had one emergency visit and the medical bills were $100 and now the plaintiff's attorney is seeking X amount, this exorbitant amount of pain and suffering, it's just hard as I sit here to say that juries are not going to look at the amount of the medical bills and have that at least potentially influence their judgment as to what is adequate pain and suffering. And if indeed those medical bills were astronomical because of all the treatment that that plaintiff received, is that fair that the jury doesn't know about all that treatment, well, I guess they'd hear about the treatment, but the amount of the bills in making a determination as to what would be the appropriate amount, assuming that the liability is met, obviously, but the appropriate amount of damages in a particular case. Certainly, and I think you hit on it in your question. The jury hears more importantly than what the medical bill was, they hear what the injury was. And they hear, for example, if a plaintiff has a cervical strain and has six weeks of physical therapy following the accident and is good to go after that. They hear if a plaintiff is brain damaged, has a mild head injury in an accident and is hospitalized and then during the course of hospitalization throws a blood clot and results in a stroke from that injury. Certainly there are injuries. A deceased plaintiff, which would be an excellent example here, a deceased plaintiff is going to incur nominal medical bills save for perhaps the ambulance charge or the mortuary charge to transport the body to the hospital. No medical bills, but that victim has paid the ultimate price. And so there you have somebody who has tremendous loss of a normal life damages, no medical bills. We leave this to the skill of the trial attorneys in presenting those cases to the jury. In looking at, under the Medicaid statutes, what the plaintiff's obligation is, there are a couple of cases I'd like to bring to the court's attention. They're in the brief. The first is McCamas v. Wallace. It's a Western District of Virginia case from 1997. And that case points out, under the Medicaid statutes, the plaintiff only has liability for the amount that Medicaid has paid, not for the difference. There's another case, Cooperative Leasing v. Johnson. That's a case from the 2nd District in Florida in 2004. That's a very important case here because that case relied on another Florida case, which looked to Peterson and said, you know what? Under the Florida statutory scheme, we're going to follow Peterson. The plaintiff was never obligated to pay that written-off amount. It's a gratuitous benefit, and we're not going to impose that on the defendant as a punishment. Peterson was a minority view at the time of Walker v. Couture. Yes, it was. And still is. Still is. It was a pure gift to the medical service. Debatable, yes. Some people will call it a gift. Some people will call that a gratuitous service. Would a reversal here reverse Peterson? I'm sorry? Would a reversal in this case reverse the finding in Peterson? I believe it would, Your Honor. Not different cases, different factually? I'm sorry? They're not different cases, different factually? Deal with different subjects? They deal with the same subject. The same subject is, what do we do with a plaintiff who has received a gratuitous benefit? It's how it was received. Here, in Peterson, it was a pure gift. Here, these were Medicare, Medicaid benefits. Yes, and I'm not referring to the amount that Medicare and Medicaid have actually paid for those bills. Certainly those are recoverable damages and should go into evidence. What we talk about is the written-off amount. And even cases cited by the plaintiff, Bynum v. Magno, Ellsworth v. Shellbrook, Pipkins v. TA Operating Corporation, those cases recognize that window, that difference between what the provider puts on the bill as the list price and what Medicaid or Medicare pay are a gratuitous service to the plaintiff. The provider never expects to recover that amount. They never expect to be paid that. Would the provider have, in this case, any lien if the amount is allowed? Does Medicare and Medicaid have the right of recoupment if the full amount, even the written-off amount, is put in front of the jury and they're awarded that amount? No, they do not. And we see that in the Evanston Hospital case where that's exactly what happened. It was, I want to say Houck v. Evanston Hospital. The plaintiff went to trial, presented a large, substantial medical bill to the jury. That bill had been substantially reduced by Medicare and Medicaid to not a nominal amount. The hospital said, wait a minute. We've accepted this nominal amount in satisfaction for our services. The court, the plaintiff went in, presented a very large amount. They presented all of the bills they recovered. They recovered the bills. They recovered several times over those bills for pain and suffering. The hospital should be allowed to recover that difference, should be allowed to recover what has been paid, and the court said no. The court said, hospital, you cannot back out. Once you submit your charge to Medicare and Medicaid, you may not back out of that and recover that difference from the plaintiff. Now, hospitals, as plaintiff's counsel mentioned, hospitals and individuals have an option. They don't have to submit a bill to Medicare and Medicaid. They can choose to go through the litigation. They can choose to exercise their right to a lien through the lawsuit and pursue the lien against the tortfeasor. And from a practical perspective, some choose to do that, some don't. But the holding here that we're seeking is a much broader holding. We're not seeking to say a plaintiff can only recover what Medicaid has paid and only recover what Medicare has paid. It's a broader holding. It's a gratuitously rendered service, and where services are rendered on a partially gratuitous basis, the plaintiff should not recover those partially gratuitous services.  It is consistent with Illinois' holding in Jones and Adams, and it would be consistent with the court's holding in Arthur. And one of the issues that you see here... Mr. Ludeman, though, I have a problem. If we do what you ask us to do, or if we affirm the appellate court, aren't we having an equal protection issue here with regard to treating the sets of plaintiffs differently, those who have Medicaid or who have no money versus those who have private insurance? No, because remember, the plaintiff with Medicare and Medicaid does not have to, the provider does not have to submit those bills. We're talking about the plaintiffs, though. Aren't we treating the plaintiffs differently for ability to recover? No. No. And what we're doing, Illinois has a balance. We're going to balance compensating the plaintiff with deterring the interest or deterring the defendant from future conduct and not inflicting a punitive effect on the defendant. Now then, with gratuitously rendered services, and let's take the purely gratuitous service that we talk about in Jones and Adams or we talk about in Peterson, the plaintiff has never had an obligation to pay that bill. The plaintiff does not get to submit that into evidence. Here, the plaintiff is getting to submit the portion of the bill that has been paid into evidence. They will have that to present to the jury. We balance, then, the plaintiff's right to compensation, right to recovery, with deterring the defendant. Now the question becomes, well, are we seeking to perhaps deter more and more deterrence by allowing a plaintiff to insert the whole medical bill? And the question then becomes really at what point is enough enough and are we then inflicting a punitive effect on the defendant? I think that this case presents the opportunity to say, no, we don't have equal protection issues here. There is no requirement that the plaintiff or anyone, any victim, submit their bills to an insurer for payment, to Medicare for payment, to Medicaid for payment. Justice Garment, you're looking like you have a question. Well, I guess my question is that, is this, comes down to whether this is more like Shriner's Hospital or it's more like private insurance. Yes, and the distinction between private insurance and Medicare and Medicaid is in private insurance, the plaintiff has gone out, they've negotiated with an insurance carrier for coverage. They've decided, I'd like to have this deductible, I'd like to have this coverage, I'd like to have this access to physicians. In the Medicare and Medicaid setting, the plaintiff does no such negotiation. The plaintiff takes what the government has already negotiated, and that's laid out very nicely in the McCambus case as to how that works. But in this instance, when the plaintiff was admitted to the hospital, wouldn't the plaintiff have had to sign an acknowledgement that they're responsible for payment of the bill? Sure, and it's up to the provider to make that decision, how they want to be paid. And the provider can say, I'd like to sit back and have whatever amount that they believe is reasonable for their services, or they can say, and hold out through the litigation. And I don't say that from a tenacious sense of stalling on the part of the defense because the plaintiff, as we know, controls when that lawsuit is filed. But the provider can say, or I'd rather have the risk of my bill being found to be unnecessary at trial managed, or even manage the risk of my services being found to be not at all necessary for this. And that occurs in cases where medical bills are not awarded by the jury. So the provider said, I'd rather have a dollar today than two dollars at the end of this case. With respect to Justice Garmon's question of what it's more like, though, isn't it somewhat of a fiction to think that, you know, John Q. Public negotiates with the providers? I mean, you're saying Medicaid, this is the way it is, right? Correct. We have this big negotiation. We don't have this big negotiation process that goes on. You have an insurance carrier. It is what it is. Most of them are insured through their employment anyway, right? So you can – okay, you're with Unicare or you're with Cigna or you're with – they have a certain policy. It's not like there's any big negotiation going on in the real world between the insured and the provider, is there? The insurance carrier is the intermediary between the insured and the provider. Right. And the insurer provides the – it's a two-way street. The insurer provides the provider with access to a pool of patients. And the provider says, in exchange for access to a broad pool of patients and guaranteed payment, I will charge these rates for my services, certainly. Okay. And I understand that, and I understand, like, the hospital doesn't have much to say with respect to Medicare or Medicaid. Here are the reimbursement rates. Here's what we're giving you. Here's what we're doing. I understand that. But as to the insured, the ultimate person that is getting the service, the insured, the plaintiff in this case, is there much difference to the plaintiff with respect to these provisions and contracts and reimbursements, whether it's private insurance or whether it's Medicare or Medicaid? Your question is, is there a difference between private? The younger person has an insurance policy, a health insurance policy. There's been negotiations between the ultimate provider of services and that carrier. But is there much difference between that situation and the 65-year-old who chooses to use Medicare or Medicaid? In terms of the services received, if that's your question, there should not be any difference between services received. They may have different access to providers. For example, an insurance may have a preferred provider group. Ultimately, should there be a difference in how the 65-year-old is treated who, for financial reasons and otherwise, has to go through Medicare or Medicaid or the 55-year-old who isn't under Medicare or Medicaid? That's the ultimate issue for this court, right? Well, remember, the 65-year-old or the 22-year-old who's on Medicaid, the 65-year-old on Medicare, the 22-year-old on Medicaid, it's the provider deciding to be paid. And they can ask, I'd like to have that bill not submitted. I'd like to have that bill as part of my lawsuit. Now, let's be candid here. When somebody's injured, what do they want? They want to be taken care of. And they want to be retreated. And they're not, hopefully at that point, looking at recovering benefits from a lawsuit. What we have here, if I may conclude. You may finish your answer. What we have here is a plaintiff who received partially gratuitous services. She falls between a completely gratuitous service, as in Peterson, and obtaining services at a discount through her own efforts and expenses, as in Arthur. Allowing the plaintiff to recover her paid medical expenses, but not the gratuity, compensates the plaintiff for her losses, serves to deter such conduct in the future, but does not have a punitive effect on the defendant. This case fits between Peterson, which recognizes the plaintiff should not recover services which are rendered on a purely gratuitous basis, and Arthur, which allows the plaintiff to recover those services which she had obtained at a discount through her own efforts and expenditures. Accordingly, I would ask this Court to affirm the appellate court and the trial court. Thank you, Mr. Levin. Rebuttal, Ms. Dusant-Fowl? Yes, Your Honors. I'd like to jump around a little bit here and first answer some of the questions members of the Court raised to my opponent. First off, I think Justice Thomas, you raised excellent questions about the impact of having the full amount of the medical bills come in front of the jury. This case, the fact that there was only an award of pain and suffering of $7,500 is an aberration. Normally, certainly we as plaintiff's attorneys always argue to the jury that pain and suffering should be, that the medical bills provide an indicia of the pain and suffering. Obviously, there's not a one-to-one correspondence, but the more the medical bills, the easier it is. That is one number to anchor an argument about what the pain and suffering award should be. But, Counselor, in this case, the jury did hear the full amount of the medical bills, according to your opening statement and the stipulation. I'm not clear from your brief whether defense stipulated to the reasonableness, but the jury did hear the full amount of the medical bills. That's right. And, in fact, there was a stipulation that there would be no argument made that the bills were not reasonable. And so there was, we were not obligated to furnish any testimony that the $80,000 of bills was reasonable, and by the same token, the defendants agreed not to contest the reasonableness of the bills. The bills were submitted as $80,000, and then in a post-trial motion, a reduction was made based on the amount paid. But there was never any, we did not have to undergo the proof of reasonableness, because the defense agreed that the bills would come in, and the legal issue of whether or not our award was limited to the amount paid was agreed to be resolved as a legal issue, and not as a factual issue on what was the reasonableness of the amount of the bills. So there was a stipulation there. Second, we do indeed have an equal protection argument here, because this Court decided in Arthur that privately insured plaintiffs are entitled to recover the reasonable value of their medical bills, even though their insurers resolved that bill and paid that bill for less, and even though once their insurers paid the bill, the privately insured plaintiffs had no liability, no longer had a liability for the full amount. Here, the exact same situation exists. Once Sheila Wills incurred those medical services, as Arthur notes, she became liable for the full amount of the bills, and the fact that later the medical providers decided to bill Medicaid did not extinguish the fact that she had a liability for that entire amount of the bill. And that's why this case is fundamentally distinguishable from Peterson, because in Peterson, the minute the plaintiff walked in the door of Shriners Hospital, the plaintiff knew and had no liability. It was a policy on behalf of Shriners to issue free services. That's not the situation here. Here, these doctors in this hospital wanted to be paid for their services, and they had a choice of what they wanted to do. They could either submit it to Medicaid or they could submit their bill in the underlying lawsuit. But, and the fact that they decided later to submit it to Medicaid does not resolve the fact that there was indeed an initial liability on the plaintiff for the full amount of the bill, just like in Arthur. And I believe we understand your distinguishing of Peterson, but to go back to something in your initial argument before the court, some of your other arguments, well, the pain and suffering issue to one, would also apply to Peterson, right? That's why it's your preference that Peter, it's interesting, because it's your preference that Peterson's overruled, although you don't need to think, you don't think it has to be overruled to prevail here, and I believe counsel thinks that if we do reverse the appellate court here, that Peterson is de facto overruled at the very least. So some of your arguments would go to overruling Peterson, right? Absolutely. That is true, indeed, because it would indeed handicap plaintiffs from showing the full amount of their damages, not just the financial loss, but also their pain and suffering, for the reasons you mentioned. But I try to be conservative. I don't ask the court to take any steps further than is necessary, so that Peterson does not have to be overruled, even though obviously it would be my preference that it would be. But as a matter of jurisprudence, it does not need to be overruled in order to reverse the appellate court in this case. In this case, though, wasn't the plaintiff here treated just like the plaintiff with the private insurance? Sure. I mean, what happened was the plaintiff went into the hospital, they generated a bill. Most of the medical providers decided to submit their bill to Medicaid. Dr. Trudeau did not. He had his bill, you know, he did not submit it to Medicaid. And then later a reduction was made. And as I pointed out, in some of the cases, you look at some of the decided cases, actually private insurance companies are getting almost the same discounts or even greater discounts than Medicare and Medicaid. And so, you know, the discounts that the insurance companies are getting is tremendous. And that doesn't differ whether it's Medicare or Medicaid. As just some of the evidence of the decided cases I cited in my brief, the private insurance companies are getting 80 percent discounts, just like Medicare. It's probably not the time to bring this up since we haven't discussed it and your yellow light is on. But, I mean, in cases that don't have this issue in them, the practice is still to negotiate liens of carriers at the end, right? And to the extent that a plaintiff can negotiate a lien, that isn't really considered a windfall. No one asked the plaintiff then to give back the money that they were awarded by the jury. So, do you want to touch on that at all? Yes, I think if I understand it, well, actually I want to tell you with the employer insurance companies, in terms of their right of reimbursements, you know, they are saying they get dollar one. So even if, say, for example, the plaintiff's contributory negligence and their award is reduced by 60 percent, the health insurers are saying, hey, we're still entitled to 100 percent on the dollar, even though the plaintiff is only getting 60 percent on the dollar because of the contributory negligence. And they're doing that as a matter of contract between the employer and the insurance company. I'm talking more of the reversal of that on the windfall argument. There are cases that don't deal with the exact issue, obviously, we have here, where after a verdict comes back, the plaintiff then negotiates down their lien and may have been awarded X amount of dollars for medical services and then not had to pay, you know, initially going in would have had to pay that because the provider had a lien, but the provider negotiates the lien down. And I've never heard the argument made that that is now a windfall for plaintiff and the plaintiff has to give the money back. Right. Well, and usually the negotiation occurs before, just before the jury verdict, because obviously once the jury verdict is awarded, then the plaintiff's leverage to negotiate is out the window. But certainly beforehand, absolutely, there is a negotiation where the plaintiff may ask the medical provider to reduce their bills, so that the plaintiff will have some more incentive to settle the case. I'd like to ask a follow-up question to Justice Garmon's question. I think it was something to the effect of it wasn't the plaintiff treated the same. I would direct that to her. It wasn't the plaintiff treated the same by the trial court following Arthur v. Couture and allowing the full amount of the medical bills in no matter what, and you indicated that neither side argued. So what would be the point of your argument that the plaintiff has to get all of this evidence in in order to be able to prevail on the pain and suffering element? You got all of that in. Well, because of the fact, well, two reasons. Because of the fact is that in the typical case, the getting the full amount of the medical bills in makes it easier for the plaintiff to argue that their pain and suffering is greater. And you got that in. In this case, that happened. Of course, the crucial thing that happened in this case was after the verdict, the court reduced the verdict so that the plaintiff was limited to $19,000 of medical expenses instead of the $80,000 of medical expenses. So your only quarrel is with the trial court's reduction, not with how the trial was conducted or whether there was a fair verdict on the pain and suffering. Right. We did not raise that issue of, you know, the amount of the pain and suffering award. Again, recognizing that it's very difficult to get that overturned in the appellate court system. But if we were to affirm the appellate court, then your argument on equal protection does exist. The plaintiffs would be treated differently. Absolutely. Absolutely. Because of the fact that the privately insured plaintiff gets to prove the reasonable value of their medical expenses and the publicly insured plaintiff does not. That's clearly an equal protection violation. Your light is on, but Justice Freeman has a question. It's clear that co-payments are made. And I think somewhere in your brief or someone's brief, it was stated that the plaintiff submits to several other obligations to receive health care benefits. Absolutely. What are those other obligations? Well, in terms of Medicaid, the plaintiff has to agree to, like for example, if the plaintiff comes in, they have to agree to become employed, to seek employment. If they're able, they have to agree to reimburse the state for all benefits paid later if they get a recovery. Even in the situation where the Medicaid recipient dies, in certain instances, their spouse can be liable for all of the bills that Medicaid paid. So there are a lot of obligations that the plaintiff has to, the Medicaid recipient has to agree. They have to apply to become eligible for Medicaid. And in order to do that, they have to promise they'll seek employment and repay the state. And there are a lot of other obligations, which I set forth in the brief. Okay. Thank you, Ms. DeSantel. And thank you, Mr. Lauderman. Thank you. Case number 104538, Sheila M. Wills v. Inman E. Foster, Jr. is taken under advisement as agenda number 13.